[Civ. No. 18501. Second Dist., Div. One. Mar. 19, 1952.]

BRENDA MARIAN DASTAGIR, Appellant, v. SABU
DASTAGIR, Respondent.

Goldman & Chaitkin and Jacob Chaitkin for Appellant.

Freston & Files and Eugene D. Williams for Respondent.

HANSON, J. pro tem.—This is a paternity suit instituted by the mother on behalf of her infant daughter to have it adjudged that the defendant was the father and under a duty to support the child. The jury returned a nine-to-three verdict in favor of the defendant.

The basic question presented to us on the record is whether the plaintiff did or did not have a fair trial.

In view of the serious contentions made by plaintiff, as appellant, it should here be stated that neither counsel for the appellant nor for the respondent was retained or participated in any of the proceedings had in the court below. Moreover, it likewise should be stated that the trial judge was placed in a most difficult and unenviable position by the conduct of counsel on both sides who tried the case before him with a jury. Time and again not only were immaterial and irrelevant questions propounded by counsel for the defense, but highly improper questions as well, and all

without the slightest objection by counsel for the plaintiff. Not only that, but he was constantly irked by counsel for both sides. If under the circumstances he failed on his own initiative to order the questions not to be answered as he had a right to do, and as we think he should have done, his attitude is understandable. Again it must be recognized that we are viewing the completed case in retrospect and not as the evidence went in piecemeal before the trial judge.

The mother in behalf of the infant contends that a fair trial was not had below in that (1) counsel for the defendant falsely insinuated in questions put to her that she was guilty of sexual relations with other men which he had no reason to believe and that therefore the questions were propounded by him solely to prejudice the jury; (2) certain instructions given were erroneous and highly prejudicial; (3) certain rulings made were prejudicially erroneous. We shall hereafter refer to the mother as the "plaintiff" and to the infant as the "infant plaintiff."

It is undisputed that the mother, an English actress at the time, unmarried and aged 20, and the defendant, a film actor, known in motion picture circles as "Sabu, the Elephant Boy," aged 23, first met in London in January, 1947, upon a film production set where a motion picture was being "shot" in which the defendant had a part as an actor and the plaintiff was employed as a "stand-in" for an actress. The very next month they began having numerous dates together, and shortly thereafter when his back was injured on the set she visited him in his flat as often as two or three times a week. She purchased food for him, assisted in preparing his meals, sent his laundry out, and engaged in other related activities. The plaintiff contends, and testified, that the two began having sexual relations as early as in February, 1947, and that this continued until the defendant left for the United States in May, and that the relations were again resumed in August of the same year when plaintiff came to the United States and lived at defendant's house occupied at the time by him, his brother, his brother's wife, and a man and wife who were guests in the house for only two weeks after her arrival. (We shall hereafter refer to this couple as Mr. and Mrs. X.) She further testified that the sexual relations continued until late in the ensuing January when she left to visit her ill mother in England. On the other hand, defendant testified that he never *at any time* had sexual relations with the plaintiff.

It should here be stated that the plaintiff testified she be-

came pregnant twice as a result of her relations with the defendant: The first time as a result of their relations in England—a pregnancy which she lost; the second time as a result of their relations in the United States as a result of which the infant plaintiff was born to her in Ireland on September 12, 1948.

It is undisputed that in June, 1947, a close girl friend of plaintiff, who had met the defendant while he was in England, wrote a letter to him wherein she stated that the plaintiff was pregnant and inquired of defendant Sabu what should be done. Shortly after the letter was mailed the defendant also received a long distance call from the plaintiff in London to the same effect. As a result of the letter and the telephone call a cablegram was dispatched by defendant, or by his brother, to plaintiff which requested that she come to defendant's home in Northridge, California, as soon as possible. Plaintiff testified that before she could arrange her affairs, procure a visa and make a plane reservation she lost her child and so advised the defendant by letter in July. This the defendant denies. But nevertheless it is undisputed that after the middle of August plaintiff arrived in New York by plane where she was met by defendant's brother Sheik and Mr. X, who as mentioned above with his wife was a guest in Sabu's house in Northridge. On the night she came by plane these men procured a room for her in a hotel in New York where they had been staying for a couple of days awaiting her arrival. The next day the trip to Northridge was begun in an auto which the men had driven from Northridge to New York. The party of three made the trip from New York to Northridge in three or four days staying overnight in motels along the way. During plaintiff's stay in defendant's home from August, 1947, until late in January, 1948, the defendant took the plaintiff to various places where they stayed overnight and sometimes as long as a week or more in hotels.

The defendant having testified he had never had sexual relations with the plaintiff explained the transmittal of the cable by saying that he feared the publicity that might ensue and that he and his brother concluded it would be advisable to send for the plaintiff. Just why they concluded that less publicity would ensue if she had her baby in England rather than the United States in the locality of defendant's home is not disclosed by the record. That the defendant never wished to marry her, never proposed to her is his testimony.

Plaintiff testified that in January, 1948, she told defendant Sabu that she feared she was pregnant (it should here be observed that if the child was born on September 12, 1948, as plaintiff testified it was, in the normal course of nature, it was conceived on or about December 12, 1947, while plaintiff was residing in defendant's home); that he thereupon suggested she take a trip of a few weeks to see her ill mother in England and then return, as her visa had three months to run; that she went to England on January 29, 1948, and after she arrived there she wrote numerous letters to the defendant and in these letters repeatedly told him she was pregnant and requested that he provide her with funds so she could return to him. She also testified to repeated endeavors on her part to reach him by telephone. The defendant flatly contradicted this testimony except he admitted receiving an undated letter from her, which he tendered enclosed in an envelope postmarked in England with the date March 8, 1948. The plaintiff contended that the undated letter (advising she had lost her child) was written and sent in July, 1947, and was not the letter she had enclosed in the envelope dated March 8, 1948.

Upon the trial had in October, 1950, there was no testimony whatever showing illicit relations between the plaintiff and any man other than defendant, and her reputation for chastity theretofore was not attacked. She denied having any illicit relations with anyone other than the defendant. The only incident remotely touching on the point to which defendant is able to point was the testimony of a woman friend—a neighbor of his—who testified that as she was leaving a New Year's party at defendant Sabu's house, at which a host of guests were present, she observed the plaintiff and Mr. X standing in a lighted area about 50 feet from the side entrance of the house with their arms about one another. ▉ The incident was of no materiality as illicit relations are neither proved, nor permitted to be inferred, unless evidence is introduced, and there was none, which shows (1) a disposition to have such relations on the part of the party charged and (2) an opportunity to gratify it. (*Mensing* v. *Croter*, 209 Cal. 318, 320 [280 P. 1026, 287 P. 336]; *Berry* v. *Chaplin*, 74 Cal.App.2d 652, 662 [169 P.2d 442].)

We come then to a consideration of the errors alleged. First, it is contended that numerous questions propounded by counsel for the defendant to plaintiff when she was called

to the stand by defendant under Code of Civil Procedure, section 2055, and upon her cross-examination of her testimony on direct, as well as that of her witnesses, were highly improper and prejudicial in that the questions were asked to besmirch the reputation of the plaintiff and her witnesses and to attribute to them misdeeds which counsel, in reality, had no reason to suppose were ever committed and which he could not and did not endeavor to prove by impeaching witnesses. Typical of such questions were the three following, addressed to the plaintiff when she was called by defendant under Code of Civil Procedure, section 2055:

"Now, referring to the time that you made this trip across the United States with Mr. X and Sheik: The second night of that trip across the country you stayed in a motel and you slept in the same room with Mr. X and Mr. Sheik, did you not? A. I did not.

"Q. You didn't; the three of you in one room? A. No, sir.

"Q. I will ask you if it isn't a fact that you stopped at a motel, that Mr. X got out of the car, went into the motel and came back and said, 'They only have one room, but they will put a cot in the room. Brenda can go in the bath room, change her clothes and go to bed and then we can each do that and go to bed'; and that after you had changed your clothes, put on your night gown and robe that Mr. X went in and changed his clothes, put on his pajamas and robe; that Sheik did the same thing; that Sheik went to bed, and that Mr. X and you sat up playing cards, and that Mr. X brought out a bottle of whisky, and you offered Sheik a drink and Sheik went, took a sleeping tablet and went to sleep; and you and Mr. X were up playing cards; is that true or is it not true? A. It is not true."

These questions detailing not only the time, the place and the persons present, but assuming as a fact various acts by her at the time, of which there was no evidence, were plainly calculated to suggest to the jury that the cross-examiner was possessed of explicit information as to the acts suggested by his questions. The questions were entirely improper from every standpoint. To be sure the initial question purported to lay a foundation for impeaching the testimony of the witness by witnesses he presumably had available, but even so the facts implied, if true, could not be shown by extrinsic evidence by witnesses and were not entitled to be shown by cross-examination as the facts

were immaterial to any issue in the case. ▮ On this point we repeat what we said in *People* v. *McDaniel,* 59 Cal. App.2d 672 [140 P.2d 88], speaking through Mr. Justice Doran as follows:

"The argument that defendant's counsel 'opened the gates' is unavailing. An error that is prejudicial is no less so because it results from a lack of knowledge on the part of either counsel or both. Legitimate cross-examination does not extend to matters improperly admitted on direct examination. Failure to object to improper questions on direct examination may not be taken advantage of on cross-examination to elicit immaterial or irrelevant testimony. The so-called 'open the gates' argument is a popular fallacy. 'Questions designed to elicit testimony which is irrelevant to any issue in the case on trial should be excluded by the judge, even though opposing counsel has been allowed, without objection, to introduce evidence upon the subject.' (27 Cal.Jur. p. 74). 'It is a settled rule that cross-examination as to matters irrelevant to the issue may and should be excluded— even though, in some cases, testimony relative thereto was elicited upon direct examination—and that a party may not, under the guise of cross-examination, introduce evidence that is not competent within the meaning of the established rules.' (27 Cal.Jur., p. 106)." (See, also, 1 Wigmore on Evidence (3d ed. 1940), § 15.)

Moreover, the questions were not asked upon cross-examination of her direct testimony given in behalf of her own case, but by direct questions put to her by counsel for the defendant when he called her in behalf of his own case under the provisions of Code of Civil Procedure, section 2055. But that aside, the questions would have been improper upon a cross-examination of plaintiff's direct testimony even if she had there testified, as she did, that she had never had illicit relations with any man other than the defendant. The short reason why she nevertheless could not thus have been cross-examined as to her alleged acts at the motel, is that such acts, if they occurred, were too remote to be of any materiality or relevancy to the issues in the case. ▮ The only question at issue was whether the defendant was or was not the father of the child born September 12, 1948. Any evidence offered to show directly or by inference that the plaintiff had sexual relations with some man other than the defendant prior to the date the child must have been conceived in due course of nature was therefore irrelevant

and immaterial to prove or disprove the issue. Such evidence submitted to a jury might well inculcate a belief that the defendant was telling the truth, and not the plaintiff, and that therefore the defendant was not the father of the child. The plaintiff was entitled to have the credibility of her testimony judged by proper and not improper testimony or inferences resulting therefrom.

The cross-examiner necessarily knew he could not prove the fact by Mr. X as the latter testified at the trial that he never had had intercourse with plaintiff. On cross-examination he was not asked a single question along the line asked of plaintiff by the three questions set forth above. We know then as a fact that the cross-examiner had at most only a single person he could call to the stand to impeach the plaintiff, if he were permitted to do so, and if in fact such person would so testify, and that was Sheik, the brother of Sabu. If in fact Sheik would have so testified, if permitted, then the question arises why Sheik did not relate the facts to Sabu the moment he reached the house occupied by him and his wife along with Sabu. Surely there was no need and no reason for not warning Sabu or for imposing on Sabu a character which Sabu tells us he did not love, never intended to marry, and one to whom he says he never proposed.

While counsel for the plaintiff made no objection to the questions, as plainly he should have done, we are yet of the view that the trial judge on his own motion should have struck out the questions and reprimanded counsel for asking them. ■ The trial judge is not a mere umpire. On the contrary he is under a duty to see that a fair trial is accorded the parties on the merits which means excluding on his own motion matters that tend only to prejudice the jurors and take them away from a consideration of the case upon its merits and its merits alone. In speaking to the point the Supreme Court in *People* v. *Durrant*, 116 Cal. 179, 211 [48 P. 75], said: "Indeed, it is the duty of a court, and one not often enough performed, to expedite business by curtailing cross-examinations upon immaterial and irrelevant matters."

It seems to us exceedingly plain from the questions of defendant which we have quoted above, and many others in the record, that his counsel elected to try the case on the basis of "when you have no case intimate misconduct on the part of the witnesses and *try them*—not the case."

This advice which was given by a notorious English barrister in the days of Dickens who pilloried him in his novels is not to be indulged in today. Our courts have time and again flayed the practice. McFarland, J., in *People* v *Wells,* 100 Cal. 459, 462 [34 P. 1078] (commenting on repeated questions asked of the defendant as a witness and concerning prior misconduct of various sorts) said: ". . . If counsel had no reason to believe the truth of the matter insinuated by the question, then the artifice was most flagrant; but if he had any reason to believe in its truth, still he knew that it was a matter which the jury had no right to consider. . . . where the prosecuting attorney asks a defendant questions which he knows, and every judge and lawyer knows, to be wholly inadmissible and wrong, and where the questions are asked without the expectation of answers; and where the clear purpose is to prejudice the jury against the defendant in a vital matter by the *mere asking* of the questions, then a judgment against the defendant will be reversed, although objections to the questions were sustained, unless it appears that the questions could not have influenced the verdict." (6 Wigmore on Evidence (3d ed. 1940), § 1808(2), p. 278.)

Marshall, J., in *Buel* v. *State,* 104 Wis. 132 [80 N.W. 78], said: "It would be a clear abuse of judicial discretion to permit such questions where the indications are plain that the purpose is not to bring out the truth in regard to the witness' life and character, and to thereby discredit his testimony, but for the purpose of discrediting the witness, regardless of whether there is any warrant for the questions or not, and if he be a party, in that way to influence the minds of the jurors into a verdict against him. . . . A reading of the questions under consideration leads to the irresistible conclusion that no idea was entertained by the cross-examiner that proof would be elicited of the matters implied by them. We say 'implied' because the asking of the direct questions in the manner in which they were asked, implied to some degree that the examiner was possessed of information upon which the questions were based, and although the answers were in the negative, the bad effect of the insinuations thrown out by the questions was not and could not have been removed entirely from the minds of the jurors. . . . The trouble here is that the cross-examination was allowed to be carried on manifestly without any reason except to create prejudice against the accused in

the minds of the jurors.'' (3 Wigmore on Evidence (3d ed. 1940), § 983, pp. 558-559.)

Cooley, J., in *Gale* v. *People*, 26 Mich. 157, 161 (commenting on the repeated putting of questions as to the defendant's past misconduct) had this to say: ''. . . A review of the evidence in this case suggests very forcibly that, however full may be the explanation, a list of questions which assume the existence of damaging facts may be put in such a manner, and with such persistency and show of proof, as to impress a jury that there must be something wrong, even though the prisoner fully denies it and there is no other evidence.'' (6 Wigmore on Evidence (3d ed. 1940), § 1808(2), p. 277.)

Marston, J., in *Scripps* v. *Reilly*, 38 Mich. 10, 15, said: ''. . . Everything having a tendency to prejudice or influence a jury in their deliberations, which is not legally admissible in evidence on the trial of the cause, should be so far as possible kept from coming to their knowledge during the trial. An impression once made upon the mind of a juror, no matter how, will have more or less influence upon him when he retires to deliberate upon the verdict to be given; and no matter how honest or conscientious he may be, or how carefully he may have been instructed by the Court not to permit such incompetent matters to influence him or have any bearing in the case, it will be very difficult, if not impossible, for him to separate the competent from the incompetent, or to say to what extent his impressions or convictions may be attributed to that which properly should not have been permitted to come to his knowledge. . . . [Rules of exclusion] would be but slight protection if counsel or witnesses could be permitted to make a statement, but not under oath, of incompetent testimony, or counsel state the same fully to the jury in their argument or *otherwise*. . . .'' (Italics supplied.) (6 Wigmore on Evidence (3d ed. 1940), § 1808(1), p. 275.)

▇ *In McDonald* v. *Price*, 80 Cal.App.2d 150 [181 P.2d 115], it is said: ''While a wide latitude should be given in cross-examinations, counsel in putting questions to the witness should not be allowed to assume facts not in evidence and state as positive assertions facts which if true would be detrimental to the opposing party's case and of such a nature as to inflame and prejudice the minds of the jurors. This is especially true where, as in the present case, there is no proof of the facts asserted. . . . The inherent

vice of the matter lies in the attempt to bring before the jury in a roundabout way facts which could not be proved and which from all appearances may have been entirely false.''

Not only is the power and the duty of the court sustained by the decisions, but in this state it is supported and commanded by statute. ''The court must exercise a reasonable control over the mode of interrogation, so as to make it as rapid, as distinct, as little annoying to the witness, and as effective for the extraction of the truth, as may be; but, subject to this rule, the parties may put such pertinent and legal questions as they see fit.'' (Code Civ. Proc., § 2044.) ''It is the right of a witness to be protected from irrelevant, improper, or insulting questions, and from harsh or insulting demeanor.'' (Code Civ. Proc., § 2066.) Unless the court promptly strikes out an improper question and rebukes counsel for asking it the damage is done. If opposing counsel objects and his objection is sustained the jury may well speculate on what the answer would have been. If no objection is made the witness' denial still leaves the damaging implication or inference of the question in the record. In such circumstances for opposing counsel to object is generally more damaging than to permit it to be answered without an objection. ''The court is no longer confined, if such ever was the rule, to the role of sitting as a mere arbitrator between opposing counsel. It is the function of the court to see that errors or extraneous matter are not brought into the case, which might have the effect of clouding the issue or confusing the jury. Where improper questions are asked the court is acting within the proper scope of its duty in striking out the offending question whether or not objections had been previously made thereto.'' (*People* v. *Yuen*, 32 Cal.App.2d 151, 160 [89 P.2d 438].)

For the purpose of intimating that plaintiff had been *guilty of misconduct* with other men the defendant was permitted to show by his own witnesses or by cross-examination (1) that on the night of plaintiff's arrival in New York that Sheik and one Wall left the hotel where plaintiff was staying to go to dinner unaccompanied by Mr. X; (2) that Mr. and Mrs. X, the plaintiff, and the defendant attended the Del Mar races together; that Mrs. X left several days before the others due to an argument with Mr. X over plaintiff (the implication was denied by both Mr. and Mrs. X); that at Del Mar plaintiff and Mr. X placed bets with book-

makers and charged the bets to defendant; that defendant told plaintiff he did not want her to have anything to do with a Mr. Y ''because he was a henchman of Mickey Cohen.'' These are but a few of a host of like questions. Plainly all these questions were objectionable and answers thereto inadmissible. (*People* v. *Crandall*, 125 Cal. 129, 135 [57 P. 785].)

In an endeavor to contradict the testimony of Sabu that she was never engaged to be married to the defendant, plaintiff sought to show the contents of a prenuptial agreement. She was permitted to testify that in September or October, 1947, she accompanied Sabu to the office of Mr. Michael Luddy (a well-known lawyer in Los Angeles) who she testified was Sabu's attorney at the time; that Mr. Luddy gave her a list of attorneys from whom she was directed to choose one to represent her; that she chose Frank Belcher (likewise a well-known lawyer in Los Angeles) and went to see him some days later; that he told her not to sign the agreement; that she did not recall the contents of the document; that she gave it back to Sabu and never saw it again. ▆ As counsel for Sabu denied there was such a document, plaintiff called Mr. Belcher to the stand. He was permitted to testify that plaintiff brought him an unsigned written document; that he read it; that he recalled the substance of its contents and advised her not to sign it. When he was asked if he had a conversation with Michael Luddy concerning the document defendant objected that the question called for hearsay and that it was privileged. The objection was erroneously sustained. The hearsay rule was not involved, as there was testimony in the record not only that Mr. Luddy was the attorney for Sabu, but that at a conference between Sabu, Luddy and the plaintiff, Mr. Luddy handed a typewritten document to plaintiff to be taken by her to Mr. Belcher. This sufficiently disclosed the agency of Mr. Luddy to act for Sabu in any negotiations which might ensue between Mr. Luddy and Mr. Belcher. Accordingly any declarations or statements made by Mr. Luddy to Mr. Belcher, in the course and scope of his employment, were those of Sabu under the doctrine that ''he who acts through another acts himself.'' In short, what Mr. Luddy said to Mr. Belcher was Sabu speaking. (4 Wigmore on Evidence (3d ed. 1940), § 1078, p. 119.) Necessarily the doctrine of privilege was not involved as what Mr. Luddy said concerning the agreement presumably was limited to matters pertaining to the

agreement with respect to which he was the agent-negotiator for Sabu. Moreover, the fact that Sabu had testified that there was no conference as testified to by plaintiff and that no agreement was drawn by Luddy, or authorized by Sabu to be drawn by Mr. Luddy, was completely immaterial. The foundation for all the other questions put to Mr. Belcher was in the record and the objection thereto was not well taken. Hence, he should have been permitted to answer them. ■ The evidence sought to be elicited was highly material in that it questioned the veracity of Sabu on material points in his own testimony, i.e., (1) that he was never engaged to plaintiff, and (2) that he never had had sexual intercourse with her. At all events the testimony was admissible to remove the unfair prejudice resulting from Sabu's testimony on the points mentioned. (1 Wigmore on Evidence [3d ed. 1940], § 15, p. 307.)

■ For the purpose of the new trial we think we should here add that Sabu testified that Sheik was authorized to act for him in handling all his business affairs, such as writing of personal letters, telegrams, cablegrams and telephone messages. Accordingly, what Sheik did within the scope of this wide authority was binding upon and admissible against Sabu despite any lack of personal knowledge of the facts on his part.

There was as we have said no evidence in the case that the plaintiff had ever had illicit relations with any man other than with the defendant and none from which the jury would be permitted to draw such an inference. Such an inference could only have been drawn if there had been evidence, and there was none, of (1) a disposition on the part of plaintiff to have sexual relations with some particular man and (2) an opportunity to gratify it. Notwithstanding this want of evidence the court instructed the jury it could find either way on the fact. The instruction reads in part as follows: "In determining whether or not it has been proven that the defendant is the father of the child, you may take into consideration whether or not the plaintiff had sexual intercourse with any other person or persons at or about the probable time when, according to the laws of nature, the child was begotten. You may also take into consideration whether or not the plaintiff had an association with some other person or persons and an opportunity to have sexual intercourse with such other person or persons, at

or about the probable time when, according to the laws of nature, the child was begotten.

"If you should find from the evidence that at, near, or about the time the child, according to the usual laws of nature, was begotten, both the defendant and some man or men other than defendant had sexual intercourse with the plaintiff and you are unable to tell which of them is the father of the child, then your verdict must be in favor of the defendant.

. . . . . . . . . . . . .

"If you find from the evidence that it is just as probable that some one other than the defendant herein is the father of the child of plaintiff, or if the evidence leaves it for your conjecture, or is evenly balanced, plaintiff has not met her burden of proof and, in such case, you must find for the defendant.

"In considering the question of whether the defendant is the father of said child or some person other than the defendant is or may be the father of said child, you are not limited in your consideration to direct evidence, but you may also consider indirect or circumstantial evidence."

 The instruction was palpably erroneous and prejudicial. (*Graves* v. *Gambrell*, 184 Miss. 61 [185 So. 238].) If the jury believed the testimony of the defendant and not that of the plaintiff it could have found that the defendant was not the father of the child, but it had no evidence before it upon which it could have found that some other person was the father of the child and as a consequence find that defendant was not the father.

For the reasons stated the judgment is reversed and a new trial ordered.

White, P. J., and Doran, J., concurred.

A petition for a rehearing was denied April 7, 1952, and respondent's petition for a hearing by the Supreme Court was denied May 15, 1952. Edmonds, J., Schauer, J., and Spence, J., were of the opinion that the petition should be granted.