## Commonwealth v. Appolloni

*Michael D. Battaglini*, Assistant District Attorney for Commonwealth.

*David P. Trulli*, for complainant.

*James J. Orlow*, for defendant.

*Opinion*

STOUT, J., May 22, 1964.—This is a proceeding under the Pennsylvania Civil Procedural Support Act of July 13, 1953, P. L. 431, sec. 5, 62 PS §2043.31, et seq., as amended by the Act of August 14, 1963, P. L. 2043.85 [1], to establish paternity of a child, Barbara, born on December 8, 1963, to Dolores A. Naumowicz in Philadelphia, and to determine an appropriate order for her support.

Miss Naumowicz, age 19, filed a verified complaint in which she named Corporal William Appolloni, a brig warden of the United States Marine Corps, as the father. Corporal Appolloni has been stationed in Philadelphia since January 4, 1963.

Plaintiff testified that she met Corporal Appolloni on January 28, 1963, his twenty-first birthday, and that, between February and June, she was in his company once or twice a week depending on his days off. She said she had "sexual intercourse" with him, and with no one else, some eight or 10 times. These sexual relations, which she described in detail, occurred downstairs in her home around midnight while her

---

[1] The amendment provides, in relevant part, that:

"(a) A support action under this act shall be commenced by the filing of a verified complaint which shall state as follows: (1) The name and address of the complainant; (2) The name and address of the defendant; (3) The date and place of marriage *if married, or if unmarried the date and place of birth of each child born out of lawful wedlock;* (4) The names and ages of any children; (5) Date and circumstances of separation or failure to support; (6) Employment of defendant and earnings; (7) Amount of public assistance; (8) Amount of support asked; (9) The complaint may contain any information to aid the locating or identification of a defendant including, but without limitation, by enumeration, a photograph of the defendant, a description of any distinguishing marks of his person, other names and aliases by which he has been or is known, his financial status, fingerprints and Social Security number, and any order of support in any other court."

parents and four younger brothers and sisters were upstairs in bed. There was never any penetration. On all occasions, except one, she said they were reclining on a couch facing each other and on the last occasion they were standing. Each time, Miss Naumowicz testified, her pants were down around her knees and defendant placed his penis between the outer lips of the vagina and there ejaculated.

Miss Naumowicz had her last menstrual period March 3rd. On April 26th, she consulted Dr. Joseph J. Szal, a member of the American Board of Obstetrics and Gynecology, about a number of complaints including amenorrhea. Dr. Szal made a vaginal examination, observed that the hymen was intact and so noted on the medical record. Because of the intact hymen, he thereafter gave a rectal examination and discovered a cystic left ovary. He ordered her to the hospital for surgery where routine laboratory work was done including a pregnancy test. It was positive, but the patient denied any possibility of pregnancy. The left ovary and appendix were removed on May 10th. At that time, Dr. Szal observed that the uterus was soft and two times its normal size and so noted on the report of operation. Dr. Szal again suggested several times to Miss Naumowicz that she was an expectant mother but she strongly denied the possibility. Dr. Szal continued his postoperative care of the patient and also gave her three injections of progesterone which were designed to bring on the menstrual period if its delay was for reasons other than pregnancy. None appeared. On July 8th, Dr. Szal ordered an X-ray of the patient's lower abdomen. The X-ray was positive and Dr. Szal notified the patient's mother of her pregnancy.

Dr. Szal said, in his opinion, conception occurred between the 13th and 23rd of March; that the uterus appeared to be approximately two months' pregnant when he observed it in May and that he detected the

fetal heartbeat July 8th, which indicated a four months' pregnancy at that time.

After receiving the diagnosis, Mrs. Naumowicz telephoned Corporal Appolloni and advised him of her daughter's condition. Miss Naumowicz also had a conversation with him the following month, August, regarding the expected child. At that time, he denied paternity and said he would give no support.

Defendant admitted he met Dolores Naumowicz on January 28, 1963; that between that time and May, or "from three weeks to a month . . . after her operation," they went bowling and to the movies occasionally, that he dated her once or twice a week at her home and that he dated no one else. He said his visits occurred late, after Dolores finished her second job. She worked during the day at Bell Telephone Company and from 5 to 9 p.m. at Lit Brothers. On one occasion he spent the weekend in her home at her parents' invitation.

Corporal Appolloni said he had been overseas nine times and had had sexual relations there but never in Ohio, his home State, nor with Dolores. The latter he never attempted because, he explained, he was afraid of making her pregnant, and he did not want to get her in trouble.

Defendant admitted, however, that on the occasions Dolores described he and she did engage in petting while lying side by side on the couch and that he "molested" her "everywhere," with his hands in her pants "a couple of times." These petting episodes, which he said continued "since I met her until after the operation," lasted between 15 and 30 minutes at which time Dolores' clothing would be above her knees but her knees would be together. He said that while he touched her thigh area and first admitted and then denied he touched the vaginal area, he said he did not know whether she wore underclothing because he "didn't

believe [he] got that far." He said his body was close to hers but he never had his penis exposed and never had an orgasm. He said that whenever they heard someone walking upstairs they "broke apart," and that at the end of the petting sessions they just sat and watched television.

Corporal Appolloni said that just before Miss Naumowicz went to the hospital she told him she might be pregnant and they discussed the matter. He told her he did not see how this could be as they never had sexual relations. After the operation, however, he said Dolores' mother told him Dolores definitely was not pregnant but that she had a cyst around one ovary. He said that while he never proposed marriage to Dolores, she mentioned it to him a few times but he told her he was not ready to get married yet.

After Dolores' return from the hospital, on the occasion of Appolloni's last visit to the Naumowicz home, the sexual relations occurred while standing. That is the only time he admitted Dolores' pants were down. When asked the purpose of having her pants down, he replied, "I couldn't say what was the purpose." He accounted for their position by saying, "She slid them down." He said that, on that occasion too, his penis was close to her private parts but unexposed.

Corporal Appolloni never returned to the Naumowicz home after Dolores' mother telephoned and advised him of the diagnosis of pregnancy. In explaining his absence, he said:

"I didn't see any sense going up there. . . . I thought it was another trick to get me up there."

Later he said he did not return to the Naumowicz home because he heard rumors that if he walked in and didn't say he was going to marry Dolores, Mr. Naumowicz "was going to have some hoods across the street jump me when I came out the door."

Even though defendant admitted he could not say

that Dolores went out with anyone else, he attempted to cast doubt on his parentage of the child by suggesting that Dolores had dated Jerry Walters, a fellow employe at Bell Telephone Company, Ernie Schwep, a friend of her father's, and Richard Polceski, from whom she had received an engagement ring. Dolores denied having dated Jerry after January 28, 1963. She said that even though she had not returned Polceski's ring, which she received prior to December 1962, she had not worn it and that even though Ernest Schwep had come to her home occasionally between January and August 1963, she had never gone out with him during that period. Appolloni suggested that Schwep offered to marry her to give the baby a name. This Dolores denied.

Joan Noelck, one of Dolores' coworkers at Bell Telephone Company, testified on defendant's behalf. She said that her husband arranged the original date between Dolores and defendant and that thereafter they double dated on several occasions until Dolores went into the hospital. She said that in July Dolores told her she was pregnant; that she had had relations with Appolloni but that Ernie Schwep wanted to marry her to give the baby a name. She said that Dolores had told her that Ernie was a friend of her father's and that she had gone out with him December 1962, New Year's Eve, at her father's request.

Pfc. Robert John Frederick Noelck, Joan's husband, and Appolloni's fellow marine, testified that he met Dolores in December 1962, on New Year's Eve, that he was supposed to have secured a date for her for the evening but the man didn't show up. He said that Dolores then told him she had a previous engagement anyway; that she was going to the club with her father and his friend Ernie.

Pfc. Noelck also testified that the first night he met Dolores she was wearing a high school ring on her left

hand and an engagement ring on the right. He said he asked her if she were engaged, and her reply was, "Not any more," that they had broken off, He said he noticed her wearing the ring for a while but did not notice it "after that." About two or three weeks thereafter, Pfc. Noelck arranged for Corporal Appolloni to meet Miss Naumowicz.

Pfc. Noelck said that just before his marriage in July 1963, Dolores told him she was approximately three and one-half to four months pregnant and that Corporal Appolloni was the father. She explained to Pfc. Noelck on that occasion that she was still a virgin but that the pregnancy occurred while they were "making out."

Pfc. Noelck said that Dolores told him that her father and mother wanted her to marry Ernie; that she had gone out with him several times but did not want to marry him and that, if she did marry him, it would be only to give the baby a name. Dolores arranged to stay with the Noelcks for a while because she said she could not stay at home because of her father.

Pfc. Noelck said he had seen Ernie at the Naumowicz home a number of times when they were there and that he belonged to the Ich Ack Club across the street where Dolores' father went.

Lieutenant Robert Edward Kirkpatrick, Appolloni's commanding officer, was called as a character witness but denied knowing his reputation for truthfulness and honesty, even though his grades for conduct and efficiency on the base were good.

This appears to be the first legally recorded case in this Commonwealth in which plaintiff experienced the rare phenomenon known as *fecundation ab extra*.

Dr. Szal testified that, in his professional opinion, pregnancy could occur without penetration of the

vagina and while the hymen was intact so long as the spermatozoa was placved in the general vulva area, and that he had had one other such case in his practice. Dr. Nicholson J. Eastman makes historical reference to cases of pregnancy despite intact hymen in Williams, Textbook of Obstetrics, 10th ed. (1950).[2] The Manual of Contraceptive Practice, edited by Mary Steichen Calderone (1964), also records that: ". . . the entry of spermatozoa may occur through . . . (4) ejaculation at or close enough to the external sexual organs of the woman so that spermatozoa can migrate into the vagina.

"Ignorance of the fact that spermatozoa possess motility of their own is usual in cases of ejaculation close to the vulva. When semen is deposited between the labia, the moisture may be sufficient for the spermatozoa to retain and exercise their motility, whereas spermatozoa deposited on the skin quickly lose it. Both married couples and young unmarried people, in various forms of petting, often rely on intercourse between the labia or between the thighs in the mistaken belief that they do not run the risk of pregnancy. Cases are recorded of women, who, while participating in this type of sexual activity, became pregnant although the hymen remained intact."

Legal as well as medical annals record such unfortunate occurrences. See, for example, Clarke (otherwise Talbott) v. Clarke, [1943] 2 All E. R. 540, where Pilcher, J., granted an annulment to the husband on the ground that the marriage of 16 years' duration had not been consummated despite the birth of a son who was then 12 years old and about whose paternity there was no doubt. The opinion read, in relevant part:

---

[2] There it is said, "Aschenbach, in 1890, collected 25 and Kanomy, some years later, 43 instances of pregnancy occurring in women with unruptured hymens": page 23.

". . . Dr. Burns, a gynaecological specialist, who was called by the husband, explained that it was well-known in the medical profession that conception could take place without penetration of the woman's vagina by the male organ. It is unnecessary to deal further with this matter, as cases of this type have already been considered by the court, and that fecundation *ab extra* is possible, although very unusual, is well established as a medical fact. The mere fact that a child was born in May, 1930, does not, therefore, in itself, establish that the marriage has been consummated."

See also the opinion of Lord Dunedin, in Russell v. Russell, 131 L. T. 482, 492 (1924), where he said:

"I have designedly used the somewhat unprecise word 'intercourse' because the facts in this case, as set forth in the summing-up of the learned judge, are very peculiar, and I should think unique. The appellant conceived and had a child without penetration having ever been effected by any man; she was fecundated *ab extra;* she had denied intercourse of any sort with any man not her husband; she had admitted that her husband had never effected penetration but she had said, and he had admitted, that he had been in use to lie between her legs with the male organ in more or less proximity to the orifice of the vagina, and to proceed to emission; . . ."

It is clear that plaintiff's impregnation occurred by *fecundation ab extra*. It is equally clear that defendant is responsible for that impregnation.

Plaintiff weighs much heavier on the scales of credibility than does defendant, whose denial of physical contact with her, in all the circumstances, is unbelievable. Moreover, even though the burden of proving paternity under the criminal statutes relating to fornication and bastardy and willful neglect to support was beyond a reasonable doubt, in this civil proceeding

plaintiff was required to prove her case only by a preponderance of the evidence. Compare I v. D, 60 N. J. Super. 211, 158 A. 2d 716 (1960) ; State ex rel. Love v. Jones, 98 Ohio App. 45, 128 N. E. 2d 228 (1953) ; Roberts v. State, 113 Okla. 150, 240 P. 2d 104 (1952) ; State v. Becker, 231 Minn. 174, 42 N. W. 2d 704 (1950) ; Spears v. Veasley, 239 Ia. 1185, 34 N. W. 2d 185 (1948). Plaintiff has borne that burden.

Defendant admitted he had no direct evidence of misconduct on the part of plaintiff with any other man but tried to imply such by asking questions concerning two men with whom she had been associated before meeting him. Miss Naumowicz denied any sexual relations with these two persons at any time and said she has not even associated with one since 1962, nor with the other since before January 28, 1963. Defendant was unable to show any continuation of whatever prior relationship had existed. His efforts to show illicit relations with these two men fell far short of proof. Compare Dastagir v. Dastagir, 109 Cal. App. 2d 809, 241 P. 2d 656 (1952) ; Brasseau v. Padlo, 113 Vt. 300, 34 A. 2d 186 (1943).

Defendant also attempted to infer that Ernie Schwep was the father of the child. According to his witnesses, plaintiff told them Ernie Schwep wanted to marry her to give the child a name even though Appolloni was the father. Plaintiff denies this. She also denies having ever had sexual relations with Schwep and attributed his occasional presence in the Naumowicz home to his friendship with her father. In bastardy proceedings, actions of third persons susceptible to innocent construction cannot be used to show paternity. See Brennan v. State, 151 Md. 265, 134 Atl. 148 (1926). Moreover, even if such proposal were made, the proposal to and even marriage of one pregnant by another to prevent the disgrace and stigma of illegitimate birth to

mother and child, though rare, is sufficiently common in human experience so that no inference of paternity can be drawn. Compare Stone v. Stone, 159 Fla. 624, 32 So. 2d 278 (1947).