[No. A016577. Sixth Dist. July 30, 1985.]

ROBERT E. BLAKE, Plaintiff and Respondent, v.
E. THOMPSON PETROLEUM REPAIR CO., INC.,
Defendant and Appellant.

## COUNSEL

Michael J. Brady, James H. Thompson, Jr., and Ropers, Majeski, Kohn, Bentley, Wagner & Kane for Defendant and Appellant.

Richard R. Sutherland for Plaintiff and Respondent.

## OPINION

**BRAUER, J.**—In a civil action based on negligence, a jury awarded the sum of $120,722.51 in favor of respondent Robert E. Blake (hereinafter Blake) and against appellant E. Thompson Petroleum Repair Co., Inc. (hereinafter Thompson). The award was reduced by an offset of $50,624, representing monies paid to Blake by Thompson's insurer, and a judgment was entered on the verdict for the sum of $70,098.51. Thompson's motion for a new trial was denied. Thompson now purports to appeal both from the judgment and from the order denying a new trial. Since the order itself is not appealable, we dismiss that portion of the appeal and go on to a discussion of Thompson's appeal from the judgment. (*Fogo* v. *Cutter Laboratories, Inc.* (1977) 68 Cal.App.3d 744, 748-749 [137 Cal.Rptr. 417].)

Thompson makes many assignments of error, most of which deal with evidence and instructions concerning damages. One claim of error is meritorious, and we therefore reverse the judgment. We conclude that the trial court committed reversible error in rejecting an instruction proffered by Thompson which would have limited the amount of damages recoverable by Blake.

### I. History

A. *Events Before Trial*

The business premises of both Blake and Thompson were housed in the same building adjacent to each other. Blake's business, known as the South-

side Machine Shop, was devoted to the machining of automotive parts, such as crankshafts, camshafts, engine blocks, and the like. Blake's premises were protected by a burglar alarm system which ran on commercial electric power and had supplementary batteries in the event of a utility power failure. Thompson's business, next door to Blake's, was that of repairing and calibrating service station fuel pumps. A common interior wall separated the two businesses.

At about 10:30 a.m. on Saturday, July 7, 1979, Blake repaired to his machine shop. He observed a Thompson employee, one Llewelyn, in the Thompson shop using a power grinder on a gasoline tank. Shortly thereafter a fire broke out in the Thompson shop, and spread very quickly. The fire department was called in to control the conflagration. While the fire was in progress, utility company employees severed all electric power connections to the building. Subsequent investigation disclosed that the fire was caused by the ignition of some flammable liquid, such as gasoline; the investigator concluded that sparks given off by Llewelyn's grinder probably caused the ignition.

The evidence was in conflict as to whether Llewelyn, when he was using the power grinder, was acting within the course and scope of his employment. For example, Llewelyn himself testified that the gasoline tank he was working on belonged to his employer, and that he had been instructed to grind a weld off the tank the evening before. Llewelyn further testified that he was paid overtime wages for the work he did that day. On the other hand, two other Thompson employees testified that the gasoline tank in question belonged to Llewelyn, and that Llewelyn intended to install the tank on his own pickup truck. Thompson's bookkeeper did not recall issuing an overtime pay check to Llewleyn for the date of July 7.

As a result of the fire, the Thompson shop was essentially gutted, and the roof over it collapsed. Blake's shop suffered heat, smoke, and water damage. The interior common wall separating the two shops was partially destroyed, and the sheetrock suffered water damage. After the fire had been extinguished, Blake contacted his burglar alarm supplier and had the damaged wiring of his burglar alarm replaced. Blake also had additional batteries connected to the system, because he feared that commercial power would not be restored for some weeks. Once the repairs were made, the system was tested and found to be fully functioning.

When Blake arrived at his shop two days later, he discovered that it had been burglarized. The thieves had sawed a hole about two feet square in an exterior wall at the front of his shop, had disconnected the battery-powered burglar alarm system, and had made off with a substantial quantity of parts

and tools. At the time the burglary occurred, utility power to Blake's shop had not been restored.

About a month after the fire, an adjuster from Safeco Insurance Company, Thompson's insurer, contacted Blake at his shop and discussed with him the results of the fire. At a subsequent meeting, the adjuster asked Blake what could be done to assist him. Blake told the adjuster that before the fire his business profits had amounted to approximately $3,000 per month. Thereafter Blake received monthly checks from Safeco, ranging in amounts from $3,000 to $5,500. In all, Blake received 13 checks totaling $50,624.

At the time of the fire, Blake was leasing his business premises from his landlord at a rate of $500 per month. That lease was due to expire in December of 1980. In August of 1979, after the fire, Blake's landlord sold the building. In November the new owner cancelled the leases of all business tenants in the building, including Blake. In December, Blake received a written invitation to negotiate a new lease with the new owner. Blake expressed reservations about a proposed increase in rent. In January of 1980, Blake received in the mail a copy of a proposed lease, which set the new rent at $700 per month. Blake decided not to enter into the new lease agreement because in his opinion his shop was not yet ready for occupancy. The shop needed interior painting, and lacked the special wiring needed to run Blake's heavy power equipment. Blake's shop subsequently was leased to another tenant, who moved in either in late February or early March.

In March of 1980, Blake began looking for·a new business location. Initially he could not find a suitable building. In June, he decided to refurbish a storage shed that he previously had leased. He resumed his business at that location in July of 1980.

Blake sued Thompson for damages in February of 1981. The complaint, which contains only one cause of action, alleges in essence that Thompson's negligence proximately caused injuries to Blake's business.

B. *Events During Trial*

At trial, Blake claimed damages for, among other things, lost business profits. In earlier depositions Blake had testified that after the fire he could not resume his business because he did not have sufficient funds. Anticipating such testimony at trial, Thompson's counsel moved that Thompson be allowed to show that Blake had received regular monthly payments, but not that the payments came from Safeco, Thompson's insurer. Counsel wanted to produce evidence tending to show that Blake had failed to mitigate his own damages, without revealing to the jury that Thompson was insured.

The court denied the motion, and ruled that Safeco, in its dealings with Blake, had been acting as Thompson's agent.[1] Thompson's counsel, thus faced with a Hobson's choice,[2] decided under protest to reveal to the jury that Thompson had insurance coverage. But he continued to object to the ruling that Safeco was Thompson's agent. Thereafter Blake on direct examination testified that Safeco was Thompson's insurer, and that Safeco "represented" Thompson. Blake also suggested in his testimony that Safeco admitted Thompson's liability for the fire.[3] The trial court gave no clear-cut admonition to the jury concerning this testimony.[4]

Thompson also moved, at the outset of the trial, that Blake's proof of lost business profits be limited to proof only of those profits lost during the period of time it took to complete the necessary repairs to Blake's shop. The court denied the motion. Thereafter an accountant called by Blake testified as to the value of Blake's lost profits from the date of the fire to the date of trial.

Thompson's counsel submitted an instruction which would, if given, have told the jury that Blake's claim of lost profits should be limited to those profits lost "during the time reasonably necessary to repair or replace the

---

[1]The court said this: "We had earlier discussed off the record whether Safeco was acting as an agent of the defendant when they perhaps discussed with the plaintiff whether he should move or not move, and things of that type. You [referring to Thompson's counsel] felt that Safeco was not an agent in making those kinds of statements, and I decided I felt they were."

[2]The phrase refers to the practice of one Thomas Hobson, an English liveryman, who required every customer to take the horse which stood nearest the door. (Webster's Third New International Dictionary, 1981.)

[3]Blake testified that the following conversation took place in the adjuster's office: "He said, 'I guess you know why you are down here?' I said no. He says, 'Well, seems like Thompson Petroleum, being our insured, seems like we have a little problem here. And I would like to see what we can do to, you know, help you with any of your problems.' And that's basically what he said."

[4]At the close of the evidence, and not before then, the trial court instructed the jury as follows: "There is no evidence before you that the defendant has nor does not have insurance against the plaintiff's claim. Whether or not such insurance exists has no bearing upon any issue in this case and you must refrain from any inference, speculation or discussion upon that subject." Then, just before the jury retired for deliberation, the court instructed them: "As was mentioned during the argument, if you find in favor of the plaintiff, you would insert as damages the total amount of damages that you find had been suffered without any offset for the amounts received from the insurance company. That will be taken care of subsequently." Taken together, these instructions were inconsistent, and did not unequivocally tell the jury to *disregard* any evidence of insurance coverage, and to consider the fact of payments to Blake only in connection with the limited issue of whether Blake failed to mitigate his own damages.

damaged property." The court rejected the instruction, with a notation that "Time limitation not applicable to this case."[5]

Pursuant to a stipulation between counsel for both parties, the jury was given only general verdict forms, so that any damages awarded would not be itemized. Accordingly, the jury returned a general verdict.

## II. INSURANCE COVERAGE

The trial court's ruling concerning evidence of insurance coverage placed Thompson's counsel in a dilemma. On the one hand, in order to prevent the jury from discovering that Thompson was insured, counsel would have had to forego the presentation of evidence showing that Blake had received any payments, and thus forego or significantly weaken his defense that Blake had failed to mitigate his own damages. On the other hand, in order to present evidence of nonmitigation, counsel would have had to bring up the fact of Thompson's insurance. Counsel chose the latter course.

We discern no less than five principles relating to the problem, each vying with the other for precedence. The principles are these:

■ (1) Evidence of a *defendant's* insurance coverage ordinarily is not admissible to prove the defendant's negligence or other wrongdoing. (Evidence Code, § 1155.) " 'The evidence is regarded as both irrelevant and prejudicial to the defendant. Hence, not only is it subject to objection and exclusion, but any attempt to inject it by question, suggestion or argument is considered misconduct of counsel, and is often held reversible error. [Citations.]' " (*Neumann* v. *Bishop* (1976) 59 Cal.App.3d 451, 469 [130 Cal.Rptr. 786], hg. den. (1976), quoting from Witkin, Cal. Evidence (2d ed. 1966) § 374, pp. 332-333.)

■ (2) On the other hand, evidence of a *plaintiff's* insurance coverage is not admissible for the purpose of mitigating the damages the plaintiff would otherwise recover from the tortfeasor. This is the "collateral source" rule. (*Acosta* v. *Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 19, 25-26 [84 Cal.Rptr. 184, 465 P.2d 72]; *Helfend* v. *Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 11-12 [84 Cal.Rptr. 173, 465 P.2d 61, 77

---

[5]The complete proposed instruction, apparently patterned after BAJI No. 14.22, read as follows: "[¶] Reasonable compensation to plaintiff for being deprived of the use of his business assets during the time reasonably necessary to repair or replace the damaged property. [¶] In determining that amount, you may consider either the reasonable rental value of the property or the lost profits which plaintiff would otherwise have earned by putting such business assets to normal use, for the period of time just mentioned." The trial judge wrote on the instruction: "Rental value not sought; Time limitation not applicable to this case."

A.L.R.3d 398].) The reason usually given for the rule is that "[t]he tort-feasor should not garner the benefits of his victim's providence." (*Helfend* v. *Southern Cal. Rapid Transit Dist., supra,* 2 Cal.3d at p. 10.) But it cannot be doubted that evidence of a plaintiff's own insurance coverage tends to diminish his chance of recovery, just as evidence of the defendant's coverage tends to enhance it.

Both of the foregoing principles are subject to the qualification that where the topic of insurance coverage is coupled with other relevant evidence, that topic may be admitted along with such other evidence. "[¶] It has always been the rule that the existence of insurance may properly be referred to in a case if the evidence is otherwise admissible." (*Turner* v. *Mannon* (1965) 236 Cal.App.2d 134, 140 [45 Cal.Rptr. 831].) The trial court must then determine, pursuant to Evidence Code section 352, whether the probative value of the other evidence outweighs the prejudicial effect of the mention of insurance. (*Acosta* v. *Southern Cal. Rapid Transit Dist., supra,* 2 Cal.3d at pp. 26-27; *Hrnjak* v. *Graymar, Inc.* (1971) 4 Cal.3d 725; 730-34 [94 Cal.Rptr. 623, 484 P.2d 599, 47 A.L.R.3d 224]; *Brainard* v. *Cotner* (1976) 59 Cal.App.3d 790, 795-796 [130 Cal.Rptr. 915].)

■ (3) In an appropriate case, a defendant has the right to show that the plaintiff failed to mitigate his damages. (*Siquig* v. *West Coast Pickle Co.* (1958) 161 Cal.App.2d 254, 258 [326 P.2d 596], hg. den. (1958); and see *Chapple* v. *Big Bear Super Market No. 3* (1980) 108 Cal.App.3d 867, 876 [167 Cal.Rptr. 103].)

■ (4) An insurer has the duty "in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." (Ins. Code, § 790.03, subd. (h)(5).) The duty extends to third-party claimants. (*Royal Globe Ins. Co.* v. *Superior Court* (1979) 23 Cal.3d 880, 888 [153 Cal.Rptr. 842, 592 P.2d 329].)

■ (5) Insurance Code section 11583 provides in pertinent part that "[¶] No advance payment or partial payment of damages made by any person, or made by his insurer under liability insurance . . ., as an accomodation to an injured person or on his behalf to others . . . because of [a] . . . potential claim . . . shall be construed as an admission of liability by the person claimed against, or of that person's or the insurer's recognition of liability, with respect to such injured or deceased person or with respect to any other claim arising from the same accident or event." (Cf. *Curtis* v. *McAuliffe* (1930) 106 Cal.App. 1, 2-8 [288 P. 675].) This section "was intended primarily to encourage early payments on prima facie meritorious

claims." (*Malinski* v. *Wegman's Nursery & Landscaping, Inc.* (1980) 102 Cal.App.3d 282, 290 [162 Cal.Rptr. 287].)[6]

■ In the light of these principles the problem comes into sharper focus. Evidence of the payments made to Blake was relevant to show (1) that Blake had received partial compensation for his alleged damages (*Turner* v. *Mannon, supra,* 236 Cal.App.2d at pp. 139-140); (2) that Blake had the financial wherewithal to defray the cost of repairing his equipment and of relocating his shop; and (3) that Blake may intentionally have delayed the regeneration of his business. Thompson had the burden of producing such evidence (principle 3). Neither Thompson nor its insurer could be pilloried in court because the payments were made (principles 4 and 5). Blake had no right to have Thompson's insurance called to the jury's attention (principle 1). Similarly Thompson had no right to show *merely* (i.e., without more) the fact that Blake had received payments, because such evidence would lead the jury to speculate (a) that Blake was a very rich man, or (b) that Blake had wealthy friends or relatives, or (c) even worse, that Blake himself was insured (principle 2).

The solution adopted by the trial court worked to the detriment of Thompson. The Hobson's choice alloted to his counsel resulted in the forced injection of highly prejudicial evidence into the trial, to Blake's undeniable benefit.

Other solutions come to mind, none of them totally satisfactory. Because we reverse the judgment below, for reasons explained in part III of this opinion, we explore the other solutions with a view toward possible retrial.

■ One solution would be to instruct the jury that the payments came from Thompson *itself*. Such an instruction would "sanitize" the evidence[7] by avoiding any mention of insurance. Blake could not have any legitimate

---

[6]In this case defendant's insurer went beyond what *Royal Globe* demanded of it by making payments to plaintiff when liability was seriously contested. For that, it deserves credit not penalization.

[7]In the field of criminal law, our Supreme Court has disapproved of efforts to "sanitize" a defendant's prior felony convictions. (*People* v. *Barrick* (1982) 33 Cal.3d 115, 126-130 [187 Cal.Rptr. 716, 654 P.2d 1243].) But in that context, the vice of "sanitizing" was, according to the Court, that the defendant still suffered prejudice, because the jury might speculate that the prior offense was equal to, or worse than, the offense for which the defendant was on trial. Here, however, we perceive no such prejudice resulting from "sanitization." "The trial judge is not a mere umpire. On the contrary he is under a duty to see that a fair trial is accorded to the parties on the merits *which means excluding on his own motion* matters that tend only to prejudice the jurors and take them away from a consideration of the case upon its merits and its merits alone." (*Dastagir* v. *Dastagir* (1952) 109 Cal.App.2d 809, 816 [241 P.2d 656], italics supplied; accord, *Hoel* v. *City of Los Angeles* (1955) 136 Cal.App.2d 295, 307 [288 P.2d 989].)

objection to such an instruction since it has been pointed out, albeit in a different context, that it is not "likely that the distinction between payment from a 'person' and a payment from 'his insurer' is apt to make much difference to the ingenuous claimant. In either instance, he is apt to treat the payment as coming from a source he identifies with the individual and thus in the nature of an acknowledgement of responsibility . . . ." (*Malinski v. Wegman's Nursery & Landscaping, Inc., supra,* 102 Cal.App.3d at p. 291.) But even if coupled with an appropriate admonition, such an instruction would mislead the jury. There lies the vice of this solution. We cannot condone any practice of court or counsel designed to misinform a jury.

A second solution would be to bifurcate the trial, so that the issues of liability and damages would be tried separately. This solution would reduce the damage done by mention of insurance, but would not eliminate it altogether. In the trial on the issue of liability, the payments received by Blake need not be mentioned at all. But in the subsequent trial (if any) on the issue of damages, the conflict between mention of insurance vs. Blake's alleged failure to mitigate damages would be resurrected.

In furtherance of this second solution, the jury could be instructed at the outset of the damages trial (1) that payments were made to Blake by Thompson's insurance carrier; and (2) that the law imposes a duty on the carrier to investigate and attempt to adjust Blake's claim. Such an instruction would minimize the prejudice to either side, and would conform to the letter and spirit of Insurance Code section 11583. The peculiar vice of this solution is, of course, the fact that insurance is mentioned to the jury. Furthermore, it appears that this solution was neither suggested nor requested by counsel below.

None of the foregoing solutions is entirely satisfactory, and no better solution has been suggested. Since we have no perfect answer we cannot say, given the circumstances of this case, that the court below committed error in attempting to strike an appropriate balance between the interests of the parties. On retrial (1) the jury should be instructed in accordance with Insurance Code section 11583, and (2) if bifurcation is requested, it must be granted.

### III. Damage Instruction

As noted earlier, Thompson submitted an instruction which would have told the jury that any award of damages for lost profits should be limited to the period of time "reasonably necessary to repair or replace the damaged

property." The trial court rejected the instruction; the only clue in the record as to the court's reasoning is the notation on the instruction itself.

In *J'Aire Corp.* v. *Gregory* (1979) 24 Cal.3d 799, 803-806 [157 Cal.Rptr. 407, 598 P.2d 60], our Supreme Court held that where a defendant negligently interferes with a plaintiff's prospective economic advantage, the plaintiff is entitled to damages for lost profits. The case arose from a dismissal following the sustaining of a demurrer, and as the principal question was one of stating a cause of action, the court did not specifically address the issue presented here. But the court did note, in passing, that "[w]here negligent conduct causes injury to real or personal property, the plaintiff may recover damages for profits lost during the time necessary to repair or replace the property," citing *Reynolds* v. *Bank of America* (1959) 53 Cal.2d 49, 50-51 [345 P.2d 926, 73 A.L.R.2d 716].

By analogy, an award of damages for lost business profits should be confined to that period of time reasonably necessary to "repair" the business, i.e., to get it back into operation at its former capacity. Put another way, an award of damages for profits lost by an interrupted business should be limited to the period of the interruption. Once a business has been resurrected, profits allegedly lost thereafter are not necessarily attributable to a defendant's negligence, and become matters of speculation and conjecture.

A trial court has a duty to instruct the jury on controlling legal principles, and to protect the parties from unjust verdicts. (*Thomas* v. *Buttress & McClellan, Inc.* (1956) 141 Cal.App.2d 812, 819-820 [297 P.2d 768], hg. den. (1956).) "[¶] Refusal to give a requested instruction is reversible error where the omission misleads and confuses the jury and it is reasonably probable a result more favorable to the requesting party would have been reached in the absence of the error." (*Canavin* v. *Pacific Southwest Airlines* (1983) 148 Cal.App.3d 512, 523-524 [196 Cal.Rptr. 82].)

In this case the jury by general verdict awarded Blake damages in the amount of $120,722.51. In argument to the jury, Blake's counsel contended that Blake's damages attributable to sources *other than* loss of business profits (such as physical damage to his parts inventory, tools, machinery, completed customer work, and including losses suffered in the burglary) amounted to $53,850.96.[8] Assuming that the jury did not discount the latter figure, the balance of the jury's award, $66,871.53, presumably was meant to compensate Blake for his alleged loss of business profits. Blake's net

[8]In arriving at this figure, Blake's counsel actually adjusted downward (discounted) some of the claims of damages that Blake made in the course of his testimony. Nevertheless, in the view of the fact that argument affords counsel his last chance to make a demand, we have adopted counsel's chosen figure.

business profits for the first half of 1979 (before the fire) were approximately $20,343. An accountant witness called by Blake testified that in his opinion, Blake would have had the same net profits ($20,343) for the second half of 1979 (after the fire), and that in 1980 (for the full year) Blake's net profits would come to approximately $45,324. Adding $20,343 (net profits from July through December of 1979) to $22,662 (net profits from January through June of 1980, half of the year's net profits of $45,334) produces a sum of $43,005. Subtracting the latter sum from the jury's apparent award for lost profits ($66,871.53) reveals a difference of $21,537.53.

It is plain that the jury was not instructed on an applicable principle of law, and it appears that had it been so instructed, a result more favorable to Thompson probably would have been reached.

In view of our conclusions thus far, we need not address Thompson's other assignments of error.

## IV. DISPOSITION

The judgment is reversed. The purported appeal from the order denying the motion for new trial is dismissed.

Panelli, P. J., and Agliano, J., concurred.

A petition for a rehearing was denied August 26, 1985, and respondent's petition for review by the Supreme Court was denied October 16, 1985.